**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CLAUDE T. HARRELL, JR., Regional )<br>Director of Region 14 of the National Labor )<br>Relations Board for and on behalf of the )<br>NATIONAL LABOR RELATIONS BOARD, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>BIG RIDGE, INC., )<br>)<br>Defendant. ) | CIVIL NO. 12-40-GPM |

# <u>MEMORANDUM AND ORDER</u>

**MURPHY, District Judge:**

      This matter is before the Court on the petition for an injunction pursuant to Section 10(j) of

the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq*., 29 U.S.C. § 160(j), brought

by Plaintiff Claude T. Harrell, Jr., Regional Director of Region 14 of the National Labor Relations

Board ("NLRB") for and on behalf of NLRB (Doc. 15).   NLRB seeks an injunction against

Defendant Big Ridge, Inc. ("Big Ridge"), the operator of the Willow Lake coal mine in Equality,

Illinois, prohibiting unfair labor practices by Big Ridge at the Willow Lake mine pending a final

decision by NLRB on a complaint by the United Mine Workers of America ("UMWA"), which is

participating in this action as amicus curiae, for unfair labor practices at the mine.   In particular,

NLRB seeks reinstatement of Wade Waller, a former employee of the Willow Lake mine who

allegedly was terminated by Big Ridge in retaliation for his organizing activities at the mine on

behalf of UMWA.   On March 6, 2012, the Court conducted an extensive hearing on NLRB's request

for a Section 10(j) injunction at which the Court heard testimony and took evidence; this Order

constitutes the Court's findings of fact and conclusions of law with respect to NLRB's request for a Section 10(j) injunction.

Section 10(j) of the NLRA authorizes a district court to enter "just and proper" injunctive relief pending the final disposition of an unfair labor practices claim by NLRB.  29 U.S.C. § 160(j). *See also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499 (7th Cir. 2008); *NLRB  v. Regal Health & Rehab Ctr., Inc.*, 632 F. Supp. 2d 817, 831 (N.D. Ill. 2009).  Section 10(j) of the NLRA provides:

> The [NLRB] shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the [NLRB] such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  A Section 10(j) decree will terminate by operation of law upon the issuance of NLRB's final decision and order.  *See Barbour v. Central Cartage, Inc.*, 583 F.2d 335, 337 (7th Cir. 1978).  Like many other forms of preliminary injunctive relief, an injunction issued under the authority of Section 10(j) has been described as an "extraordinary remedy."  *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996) (quoting *NLRB v. P*I*E* Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989)); *NLRB v. Irving Ready-Mix Inc.*, 780 F. Supp. 2d 747, 757 (N.D. Ind. 2011).  Thus, relief under Section 10(j) should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process."  *Electro-Voice*, 83 F.3d at 1566 (quotation omitted).  Correspondingly, "[t]he familiar factors that courts reference in weighing the propriety of preliminary injunctive relief

in other contexts – the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint – apply to requests for relief pursuant to section 10(j) as well." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001) (citing *Kinney v. Pioneer Press*, 881 F.2d 485, 490 & n.3, 493 (7th Cir. 1989)).  Thus, NLRB will be entitled to interim relief when:  (1) NLRB has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public harm" would occur in the absence of interim relief; and (4) NLRB has a reasonable likelihood of prevailing on the merits of a complaint.  *Id.* (citing *Electro-Voice*, 83 F.3d at 1567-68).  "The strength of the [NLRB's] case on the merits affects the court's assessment of the relative harms posed by the grant or denial of injunctive relief:  the greater the [NLRB's] prospects of prevailing are, the less compelling need be [the agency's] showing of irreparable harm in the absence of an injunction."  *Id.* at 286-87.

"The [NLRB] bears the burden of establishing the first, third, and fourth of the above factors by a preponderance of the evidence."  *Spurlino Materials*, 546 F.3d at 500.  *See also Electro-Voice*, 83 F.3d at 1567.  However, as noted above, the strength of the NLRB's case on the merits affects this Court's assessment of the relative harms posed by the grant or denial of injunctive relief.  *See Spurlino Materials*, 546 F.3d at 500 (citing *Bloedorn*, 276 F.3d at 286-87).  As such, the second prong is evaluated on a sliding scale:  the better the NLRB's case on the merits, the less compelling need be the showing of irreparable harm in the absence of an injunction, and vice versa. *See id*.  But even with the sliding scale between probability of success on the merits and degree of harm, the petitioner for Section 10(j) relief must surpass the "possibility" threshold into "likelihood"

on each prong.  Said differently, it must be likely that the petitioner will succeed on the merits and it must be likely that the petitioner will suffer irreparable harm in the absence of an injunction, and the sliding scale does not remove the burden of this likelihood threshold from the petitioner.  *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.") (emphasis omitted); *Nken v. Holder*, 556 U.S. 418, 434-35 (2009) (noting that the "possibility" standard for success on the merits and irreparable harm is too lenient). "Likely" means more than "better than negligible" and "more than a mere possibility of relief." *Nken*, 556 U.S. at 434 (quotation marks omitted).

Moreover, it is the case that a court considers a request for an injunction under Section 10(j) "with an eye toward the traditional equitable principles." *Kinney*, 881 F.2d at 490.  However, Section 10(j) proceedings differ from ordinary preliminary injunction situations in a fundamental sense.  Typically, a motion for a preliminary injunction requires a district court to undertake its own analysis of the moving party's likelihood of success on the merits of its claim.  *See, e.g., Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897-902 (7th Cir. 2001); *Curtis v. Thompson*, 840 F.2d 1291, 1297-99 (7th Cir. 1988).  By contrast, in considering the moving party's "likelihood of success" in the Section 10(j) context, "it is not the district court's responsibility . . . to rule on the merits of the [NLRB's] complaint." *Bloedorn*, 276 F.3d at 287.  In fact, "a federal court has no jurisdiction to pass on the merits of the underlying case before the [NLRB]." *Electro-Voice*, 83 F.3d at 1567.  Instead, "deciding the merits of the case is the sole province of the [NLRB]." *Spurlino Materials*, 546 F.3d at 502.  The United States Court of Appeals for the Seventh Circuit has explained that the "court's mission" in a Section 10(j) case "is to determine whether the harm to

organizational efforts that will occur while the [NLRB] considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the [NLRB'] remedial powers ineffectual." *Electro-Voice*, 83 F.3d at 1567.  In undertaking that task, "[t]he district judge must assess not only the harm that may go unchecked during the 'notoriously glacial' course of NLRB proceedings . . . , but also the probability that the General Counsel will succeed in convincing the NLRB that someone has in fact violated the labor laws." *Kinney*, 881 F.2d at 491 (quoting *Boire v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 479 F.2d 778, 788 (5th Cir. 1973)).  In short, "[a]ssessing the [NLRB's] likelihood of success calls for a predictive judgment about what the [NLRB] is likely to do with the case." *Bloedorn*, 276 F.3d at 288.  The administrative law judge ("ALJ") is "the NLRB's first-level decisionmaker, and, '[h]aving presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.'" *Spurlino Materials*, 546 F.3d at 503 n.4 (quoting *Bloedorn*, 276 F.3d at 288).

As the Court explained above, Section 10(j) relief is an extraordinary remedy, reserved for those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute-resolution process.  *See Spurlino Materials*, 546 F.3d at 502.  The purpose of Section 10(j) is to prevent employers from taking advantage of the "extraordinarily slow" NLRB resolution process to quash union support in the interim.  *Id.* at 500.  "Time is usually of the essence . . . , and consequently the relatively slow procedure of [NLRB] hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives – the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining." *Kinney*, 881

F.2d at 488 (citing S. Rep. No. 80-105, 80th Cong., 1st Sess. 8 (1947)).  "Hence we have provided that the [NLRB], acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek such relief in the case of strikes and boycotts defined as unfair labor practices." *Id*.  "A court should evaluate the equities through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge." *Lineback v. Printpack, Inc*., 979 F. Supp. 831, 847 (S.D. Ind. 1997) (quotation and citation omitted).  In assessing the propriety of injunctive relief, consideration must be given to the collective bargaining rights of the employees and what belated relief may mean to the future exercise of those rights.  *See Bloedorn*, 276 F.3d at 297.  A court must consider whether, in the absence of the injunctive relief requested by NLRB, the collective bargaining and organizing rights of employees will be irreparably undermined.  *See Electro-Voice*, 83 F.3d at 1567 ("[C]onsidering the aforementioned factors . . . , this Court's mission is to determine whether the harm to organizational efforts that will occur while the [NLRB] considers the case is so great as to permit persons violating the [NLRA] to accomplish their unlawful objectives, rendering the [NLRB's] remedial powers ineffectual."); *P*I*E Nationwide*, 878 F.2d at 209 (a Section 10(j) injunction should be "granted only in those situations in which effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process."); *NLRB v. Graphic Arts Int'l Union (GAIU) Local 277*, 513 F.2d 1017, 1021 (7th Cir. 1975) ("Experience under the [NLRA] has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the [NLRB] has not been able in some instances to correct unfair labor practices until after substantial injury has been done.").

The Court turns at last to the merits of NLRB's request for a Section 10(j) injunction. This calls in turn for the Court to address the facts of the case as they appear from the record. In March 2011, UMWA began an organizing campaign to represent the approximately 440 production and maintenance workers at Big Ridge's Willow Lake coal mine in Equality, Illinois. *See* Doc. 15-3 (Decision of ALJ Jeffrey Wedekind) at 2.  The workers already were represented at that time by the Boilermakers Union, but negotiations for a new contract to replace the existing agreement between Big Ridge and the Boilermakers Union that was due to expire April 15, 2011, were going badly.  *See id*.  UMWA's organizing campaign among the workers at the Willow Lake mine was very successful, garnering authorization cards from ninety-three percent of the unit employees, and the Boilermakers Union later disclaimed interest in further representation of the Willow Lake production and maintenance workers when the Boilermakers Union's contract with Big Ridge expired.  *See id*.  However, Big Ridge denied UMWA's request on April 7, 2011, for voluntary recognition of UMWA as the Willow Lake employees' collective bargaining representative.  *See id*.  Furthermore, Big Ridge proceeded to conduct a vigorous anti-union campaign in response to the petition made by UMWA on April 8, 2011, to NLRB for a secret-ballot election.  *See id*.  Big Ridge held a series of group meetings with employees, which included slide shows, films, and presentations by officials from Peabody Energy, Big Ridge's parent company. *See id*.  Big Ridge distributed flyers with employee paychecks, mailed letters and videotapes to employees' homes, and made anti-union stickers available for employees to wear on their hardhats. *See id*.  Also, Big Ridge polled its supervisors about how employees were likely to vote on representation by UMWA, and directed the supervisors to make one-on-one contact with employees to encourage them to vote against UMWA representation.  *See id*.

Despite Big Ridge's aggressive anti-union campaign, UMWA narrowly won the elections conducted on May 19-20, 2011, by a vote of 219-206; of the 425 employees who voted (ninety-seven percent of those eligible), approximately fifty-two percent voted in favor of UMWA representation. *See* Doc. 15-3 at 2. However, on May 26, 2011, Big Ridge filed timely objections seeking a rerun election based on allegedly improper conduct by UMWA in the run-up to the May 19-20 elections. *See id*. at 2-3. UMWA responded by filing charges of unfair labor practices against Big Ridge, in particular alleging that Big Ridge had terminated Wade Waller, an employee at the Willow Lake mine and a strong supporter of UMWA, in order to chill union support at the mine. *See id*. at 3. Waller has approximately twenty-eight years' mining experience and worked as a ram car driver at the Willow Lake mine for over seven years before his discharge by Big Ridge on May 27, 2011. *See id*. at 4. By all accounts Waller was a good employee, hard-working, experienced, dependable, well-liked, and willing to fill in on his days off. *See id*. at 48. Although he had a reputation for being loud (as Waller himself admits), he did not have a reputation for being violent. *See id*. Further, until his discharge, he had never been called into the office or disciplined for even the slightest infraction, safety-related or otherwise, over the entire seven years of his employment at the Willow Lake mine. *See id*. There is no dispute that Waller actively and openly supported UMWA during and after the union's campaign to represent Willow Lake employees. Waller frequently wore a camouflage UMWA shirt back and forth to work. *See id*. at 47. He put eight to ten UMWA stickers on his hardhat. *See id*. He even put one of Big Ridge's "VOTE NO" stickers on his hardhat, covering up half of the sticker so that it read "VOTE UMWA." *See id*. Waller also distributed at least 100 UMWA stickers to other Willow Lake employees, and wrote and sang a derogatory song at the mine about "scabs" who did not support UMWA. *See id*. at 47-48.

In short, although many other Willow Lake employees also openly supported UMWA, the record reflects that, in fact, Waller was one of the strongest and most outspoken UMWA supporters at the Willow Lake mine. *See id*. at 48.

The ostensible reason for Waller's discharge was an alleged threat to kill a fellow employee, Ron Koerner. Big Ridge claimed that Koerner, a feeder watcher, told ram car driver Waller to stop his approach to the feeder, at which time Waller is alleged to have said that Koerner could flag him all he wanted but Waller would not stop. *See* Doc. 15-3 at 45. In the proceedings before the ALJ, Koerner admitted that neither he nor anyone else was in the path of Waller's ram car when Koerner flagged Waller to stop. *See id*. at 47. If nobody was in the path of Waller's ram car, then Waller's statement to Koerner was not a credible threat to kill or injure anyone. Koerner also told the ALJ that he never felt his life was in danger and never told Big Ridge that he thought Waller was going to kill him. *See id*. at 52. Thus, it appears that, at most, Waller disregarded an inexperienced feeder watcher's request to stop dumping coal at the feeder. Said differently, Waller and Koerner simply had a disagreement over whether the feeder was too gobbed up to continue dumping Waller's coal. Koerner "flagged" Waller with his helmet light to stop dumping so the feeder would not get gobbed up, and Waller decided to override him and continue dumping because he did not believe that Koerner, who was new to both the mine and feeder watching, had any idea what he was talking about, and Big Ridge was pushing its crews to get their production numbers up. *See id*. at 52. As the ALJ recognized, heated, angry arguments and confrontations in which employees threatened to physically injure each other were common at the Willow Lake mine, and were tolerated at the mine. *See id*. at 48. It is undisputed that, since 2002, when Peabody acquired the Willow Lake mine, Big Ridge had never discharged any other employee for conduct like Waller's, absent any significant

physical contact between quarreling employees. *See id*. at 48-49.  In sum, the overwhelming weight of the evidence indicates that Big Ridge never really believed that the May 20 flagging incident was anything more than a routine work dispute, not a credible threat by Waller to run over or kill Koerner.  Waller's alleged threat to kill Koerner was simply the way Big Ridge chose to "spin" the incident between Waller and Koerner as a pretext for discharging one of UMWA's strongest and most vocal supporters at the Willow Lake mine, given Big Ridge's history of tolerating similar or worse conduct by others unrelated to union activity.

Significantly, Waller was discharged less than a week after the election, and the very day Big Ridge announced to Willow Lake employees its objections to the election; additionally, Big Ridge informed employees that UMWA's unwanted election victory and Waller's discharge would be tried together at the same administrative hearing, further underscoring the connection between the election and Waller's discharge.  The evidence is clear that support for UMWA among Willow Lake employees has been chilled by Big Ridge's vigorous anti-union campaign, including the discharge of Waller.  For example, the decline in attendance at UMWA's meetings warrants the inference that support for UMWA has been chilled.  Hundreds of Willow Lake employees attended UMWA's first meeting, and subsequent pre-election meetings drew a large attendance as well, according to Greg Fort, a Willow Lake employee and president of UMWA Local No. 5929:

> Q. Okay.  So the union's organizational meetings before the election – we were talking about the attendance.  You said there were three.  Do you recall the levels of attendance at those meetings?
> A. Like I said, the first meeting was very high because that's when we signed the cards.  The next meetings, we had moved.  We've got a classroom beside our office that we hold our meetings in.  We set up maximum probably 40.  We set up between 30 and 40 chairs for them meetings, and the meetings for – that we're talking about before, after the first meeting we had to move into a bigger room because we didn't have room for everybody in our little classroom.

Q. How many does that room seat?
A. We set up chairs – somewhere between 80 to 100 chairs in there.

\* \* \* \*

Q. Do you have a specific recollection of each of the three meetings before the election?
A. To give you a specific date, I can't. I know we had the March 30th meeting and then we had one before the election in May, but I can't give you a certain date on what day that was.
Q. Were you in attendance for each of those meetings?
A. Unless I was at work. Like I said, we had the 9:30, 12:30 and 5:30 meeting. If I was on day shift, I made the evening meetings. If I was on second shift, I made the morning meetings.
Q. And so the three meetings that were after the March meeting, can you approximate for us the attendance at each of those meetings? Are you able to do that?
A. The best of my estimate, I would say the ones before the election we were probably in the 80 to 100 neighborhood out of all. The morning meeting we had a real good attendance. Usually our noon meetings was just the guys coming in before second shift. That was a smaller meeting. And then our evening meetings was all – you know, pretty good attendance. So I would estimate it, probably the morning meeting, between 60 to 80; the afternoon meeting, somewhere between 20, 30 guys; and evening meeting, between 60 and 80.
Q. Okay. And that applies, as far as you can recall, to each of the three meetings?
A. Yes, except for the first one, and that was when we signed the cards.
Q. Was there a meeting after the election?
A. Yes. I think the 24th we had a meeting right after the election.
Q. Okay. Do you have a recollection of the attendance at that meeting?
A. It was still a real good turn-out. I would estimate it on the same as the before, maybe a little more. Our morning meeting was a big meeting, the noon meeting was smaller, and the evening meeting was a bigger meeting.

Doc. 48 (Transcript of Hearing on Injunction on March 6, 2012) at 66-68. Thus, according to Fort,

even the post-election union meeting, held on May 24, 2011, was about as well attended as previous

union meetings. However, attendance at UMWA meetings decreased substantially after Big Ridge

announced its objections to the union election and discharged Wade Waller; as will be discussed,

attendance at union meetings has plummeted as this case has wound its way through the NLRB

administrative process.

The impact of threats by Big Ridge to shut down the Willow Lake mine and Big Ridge's unlawful discharge of Waller is that some employees fear that the mine will shut down and/or that they will be discharged for openly supporting UMWA, as Waller was.  For example, two Willow Lake employees who recently quit, Tim Darnell and Don Lamply, told Fort that they quit, at least in part, because they feared the mine would close:

> Q. Have you made any effort to look at anything that would give you information as to about how many people have quit?
> A. Go with some of our membership list that's got addresses and phone numbers on it.  I done one back in the first of 2011 and compared it to our last one and marked the names of 9 people that wasn't there any more, and just estimate, it's 40 to 45 people on that difference.
> Q. Okay.  And have you talked to any of the people who've quit?
> A. Yes, I have.
> Q. Okay.  And have any employees on your crew quit?
> A. Yes.  We've had people on my crew quit.
> Q. Have you spoken to them about that?
> A. A few of them, yes.
> Q. Who?
> A. Tim Darnell's one of them.  He left our crew, went to another mine.
> Q. Did he say why?
>
> * * * *
>
> A. He was afraid the mine was going to shut down, just didn't have good job security there and was tired of being treated – he didn't feel like he was being treated good and paid right, so he had an opportunity to leave and left.
> Q. Was that an in-person conversation?
> A. Yes.  This was – I talked to him right before he left.
> Q. Do you know when that was?
> A. To give you an exact date, no.  It's been two, maybe three months ago.
> Q. Have you had any occasion recently to speak with somebody who quit?
> A. Yes, I did.
> Q. When?
> A. I talked to a guy this morning.
> Q. Who?
> A. Don Lamply.
> Q. Tell me about the conversation.  Who's Don?
> A. Don Lamply was an employee that worked – I think he was on C-crew, but he

worked at the mine, and he left to go to another different mine.
Q. Okay.  Tell me about the conversation.

\* \* \* \*

A. I called Don yesterday, talked to him, and he was asleep.  He works third shift at the mine.  And he called me back this morning and I asked him, I said, *You know, give me a reason why you left our mine*, and it was basically the same reason.  He said that he was afraid the mine wasn't going to make it and he was tired of being treated the way they were treating us.

Doc. 48 at 69-71 (italics in original).

Fort testified that, whereas his earlier efforts to discuss UMWA among Willow Lake

employees were well-received, as Big Ridge's anti-union campaign, including the discharge of

Waller, continued, Willow Lake employees became less receptive:

Q. Before the election did you have any occasion to talk to employees about the union?
A. Yes.
Q. Did you try to sell the union to employees?
A. Yes.
Q. What kind of reception did you get from the employees?
A. Before the election it was a good reception.  I mean just anybody you talk to would talk.  I talked to a lot of supporters that was all for it.  I talked to a few guys that was against it, but you know, they would – you could have a civil conversation with them.  Nobody get mad.  You know, we could – they could express their opinions on why they were against it, I've expressed my opinions on why I was for it, and the other guys, you know, that was for it, you know, would ask questions, how something was going to be.  And we had a lot of conversations.
Q. And when during your business day does that happen at work?
A. That would be before the shift, before work in the washhouse, and sometimes after work.
Q. Okay.  Now, tell me about the employee reaction to you talking about the union after the election, the objections and Waller's discharge.  So since that time.

\* \* \* \*

Q. After Waller's discharge, did you continue to try to speak to employees about the union?
A. Yes.

> Q. Did you observe in your – in doing so, any difference in the reception that you got from employees at the mine?
> A. Yes.
> Q. Okay.  Can you explain that to the Court, please.
> A. The – a lot of the diehard older guys had been there awhile that were good union supporters would still talk, you know, and have conversation about it.  A lot of the newer hired employees, younger guys, when you'd set down and start talking, you notice them get up and walk off, and they'd give you the cold shoulder.  They just didn't want to talk about the union.  They wanted to get away from you when you come around.
> Q. And are you thinking of specific instances?
> A. Just – I mean that happened all the time.
> Q. Is it still happening?
> A. Yes.
> Q. And are you aware of any employees who supported the union before the election and Waller's discharge openly and changed at some point around the election time?
> A. Yes, I am.
> Q. Okay.  Who?
> A. There's a number of them on my crew that I've noticed.  Some of the guys on the other crews told me the same thing on their crews.  On my crew some of them that come to mind would be Shane Duty, Mike Bevis, Kevin Collins, Mark Woolard.

Doc. 48 at 71-73.  Since returning to work at the Willow Lake mine on August 18, 2012, following an injury, employee Dan Bradley has overheard about a half-dozen conversations among employees about what they feel will happen to the mine if UMWA is certified.  Bradley overheard employees say that "if the UMWA come in to represent the men at the mine, that Peabody would shut the coal mine down." *Id*. at 53.  Bradley also has heard employees say that "Peabody would shut the mine down, that they was big enough that they could close that mine and it wouldn't affect them." *Id*. at 54.  Several employees who formerly supported UMWA openly have removed union stickers from their hard hats.  One of those employees, Shane Duty, supported UMWA until at least May 21, 2011.  It was only after Waller's discharge that Duty took UMWA stickers off his hard hat. *See id*. at 76.  Another employee told Fort that he took UMWA stickers off his hard hat because "*I didn't want to be a victim like Wade Waller*." *Id*. at 106 (italics in original).

Willow Lake employees who still support UMWA fear openly engaging in union activities. Employees have made statement to Fort like, "*I'm still behind the union, I support it, but I don't want to stick myself out there*."   Doc. 48 at 77 (italics in original).   On February 20, 2012, Willow Lake employee Larry Gribble was heard at an UMWA meeting telling retiree John Watson he was afraid to support UMWA openly at work because of Waller's termination, that he was not going to speak up openly about UMWA in a group, that he might have one-on-one conversations about UMWA, but that he wasn't going to speak up in front of Big Ridge officials. *See id*. at 36-37. Gribble continued that, at his age, he was afraid of being assigned a bad job or being totally terminated and unable to find other employment. *See id*. at 37.   Willow Lake employees are aware of these proceedings and are tiring of the time it is taking for Wade Waller to be reinstated to his job at Willow Lake. *See id*. at 78-79.   Fort testified that he has had a lot of conversations with employees about the protracted nature of the NLRB proceedings and that there is a lot of frustration among employees, who believed that Waller would be reinstated after the ALJ's decision. *See id*. at 78-80.   As Fort put it, "There's a lot of frustration on how long it's took, and a lot of employees have asked me, you know, *What's going to happen?   Why hasn't Wade come back to work?   Why isn't it* [UMWA] *certified?   Is Peabody too big for the law?   Is anybody going to do anything about this?*"   *Id*. at 80 (italics in original).   In the Court's view, failure to issue a Section 10(j) injunction in this case will send a clear message to Willow Lake employees that Big Ridge, a subsidiary of Peabody Coal's non-union business group, is too big for the law and that not even NLRB can do anything to help Willow Lake employees.   Fort acknowledges that UMWA is not contending it has lost all support among Willow Lake employees. *See id*. at 77.   However, the fact that some Willow Lake employees continue to support UMWA does not negate the evidence of likely

irreparable harm.  What is significant is Fort's testimony that "there's a lot of employees that support it but they don't openly support it.  Like I said, they've took the stickers off their hat.  And if you talk to them, they'll tell you, *you know, yeah, I'm still behind the union, I support it, but I don't want to stick myself out there*."  *Id*. at 77 (italics in original).  This fear is a direct result of Big Ridge's unfair labor practices which, if not enjoined, will put UMWA in a significantly weakened position upon NLRB's eventual certification of UMWA as the bargaining representative of Willow Lake employees.

The Court turns then to the adequacy of UMWA's remedy at law.  In general, a court "owe[s] the [NLRB] a favorable construction of the evidence, much as we would if [NLRB] were a plaintiff appealing the grant of summary judgment in favor of the defendant.  We will therefore credit [NLRB's] factual averments so long as they are plausible in light of the record evidence." *Bloedorn*, 276 F.3d at 287 (citations omitted).  "We must also bear in mind that it is [NLRB], and not this court, which is principally charged with the administration and enforcement of the [NLRA]." *Id*.  As discussed, Section 10(j) relief is an extraordinary remedy, reserved for those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute-resolution process.  The purpose of Section 10(j) is to prevent employers from taking advantage of the "extraordinarily slow" NLRB resolution process to quash union support in the interim.  *Spurlino Materials*, 546 F.3d at 500 ("The process of NLRB resolution has long been recognized as extraordinarily slow – indeed, the purpose of section 10(j) was to prevent employers from taking advantage of this significant passage of time in their efforts to quash union support in the interim.").  "A court should evaluate the equities through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the

[NLRB's] remedial power while it processes the charge." *Printpack*, 979 F. Supp. at 847 (quotation omitted).  In assessing the propriety of injunctive relief, consideration must be given to the collective bargaining rights of the employees and what belated relief may mean to the future exercise of those rights.  Put another way, the Court must consider whether, in the absence of the requested injunctive relief, the collective bargaining and organizing rights of the employees will be irreparably undermined. *See Bloedorn*, 276 F.3d at 297 ("We must consider whether, in the absence of the relief that the [NLRB] has requested, the right of store workers to organize, and to reap the benefits of collective bargaining, will be irreparably undermined."); *Electro-Voice*, 83 F.3d at 1567 ("[C]onsidering the aforementioned factors . . . , this Court's mission is to determine whether the harm to organizational efforts that will occur while [NLRB] considers the case is so great as to permit persons violating the [NLRA] to accomplish their unlawful objectives, rendering [NLRB's] remedial powers ineffectual.").  Considering the facts of this case, the remedial authority of NLRB cannot entirely cure the harms that are likely to occur in the interim.  Notably, Big Ridge's actions have dramatically shifted the status quo between itself and its employees by refusing to bargain with the employees' representative and retaliating against vocal UMWA supporters like Wade Waller. Moreover, as time passes, Big Ridge's actions diminish UMWA's ability to organize and effectively represent Big Ridge's employees after NLRB issues its final decision.  Consequently, UMWA and NLRB are without adequate remedies at law.

In addition to demonstrating some likelihood of success on the merits, NLRB must show that, absent an injunction, the labor effort will likely be irreparably harmed, and that such irreparable harm to the labor effort outweighs any comparable harm to the employer. *See Kinney*, 881 F.2d at 491; *Printpack*, 979 F. Supp. at 847.  As stated previously, the strength of NLRB's case on the merits

affects the assessment of the relative harms.  *See Spurlino Materials*, 546 F.3d at 502; *Bloedorn*, 276 F.3d at 286-87; *Printpack*, 979 F. Supp. at 839.  Specifically, the greater the NLRB's prospects of prevailing on the merits, the less compelling a showing of irreparable harm is required, and vice versa.  *See Electro-Voice*, 83 F.3d at 1567-68 ("[T]he Director [of NLRB] need not demonstrate that the harm to the labor effort outweighs the harm to the employer if the Director makes a strong showing [of likely success on the merits]."); *Printpack*, 979 F. Supp. at 839 ("[A] strong showing by [NLRB] of likely success on the merits can offset a weak showing of harm.").  The Court concludes that NLRB has a better than negligible likelihood of success on the merits of the unfair labor charges pending before the agency.  Further, Big Ridge's employees are currently suffering significant harm due to the employer's refusal to bargain collectively with their chosen representative, and UMWA's ability to represent the employees' interests in the future will likely suffer irreparable harm in the absence of interim injunctive relief.  As such, the equities tip strongly in NLRB's favor.

Finally, the Court must examine whether Section 10(j) relief is in the public interest, weighing the potential public benefits against the potential public costs.  *See Electro-Voice*, 83 F.3d at 1573-74.  The Seventh Circuit Court of Appeals has stated that "the interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process." *Bloedorn*, 276 F.3d at 300 (quotation omitted).  "The public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the [NLRB] takes too long to investigate and adjudicate the charge."  *Electro-Voice*, 83 F.3d at 1574 (quotation omitted).  Similarly, the public interest is harmed when NLRB's remedial powers lose their effectiveness due to the passage of time. *See Printpack*, 979 F. Supp. at 847.  The public interest would be served by interim injunctive relief

here due to the serious nature of the alleged unfair labor practices and the strong evidence that supports NLRB's allegations. Such relief will "help to preserve [NLRB's] remedial authority and in that way serve the collective bargaining process." *Bloedorn*, 276 F.3d at 300. Furthermore, there is no evidence that injunctive relief would lead to any public harm. Interim relief therefore is in the public interest.

To conclude, NLRB's petition for a Section 10(j) injunction (Doc. 15) is **GRANTED**, and it is hereby **ORDERED** that, pending final disposition of the matters involved pending before NLRB, that:

1.      Big Ridge, its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with it or them, pending the final disposition of the matters involved herein pending before NLRB, are enjoined and restrained from engaging in the following acts and conduct:

(a)      Threatening employees with mine closure, job loss, or other unspecified reprisals because they support UMWA;

(b)      Promising employees benefits if they oppose UMWA;

(c)      Discharging or otherwise discriminating against employees because they support UMWA or discouraging employees from supporting UMWA; and

(d)      In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the NLRA.

2.      Big Ridge is hereby **further ORDERED** to:

(a)      Within five (5) days of issuance of this Order, offer immediate and full interim reinstatement in writing to Wade Waller, to his former position, at his previous wage and all other

former terms or conditions of employment, displacing, if necessary, any employee hired, transferred, or reassigned to replace him, or, if his former position is no longer available, to a substantially equivalent position of employment;

        (b)    Within fourteen (14) days of issuance of this Order, post copies of this Order at Big Ridge's Willow Lake mine and associated facilities located at Equality, Illinois, in all places where notices to employees are customarily posted.  Said postings shall be maintained during the pendency of NLRB's proceedings free from all obstructions and defacements, and agents of the Regional Director of Region 14 of NLRB shall be granted reasonable access to the Willow Lake mine and associated facilities located at Equality, Illinois, to monitor compliance with this posting requirement, and;

        (c)    Within fourteen (14) days of issuance of this Order, submit to the Regional Director of Region 14 of NLRB a sworn affidavit from a responsible official describing with specificity the manner in which Big Ridge has complied and will continue to comply with the terms of this Order, including the location of the documents to be posted under the terms of this Order.

        It is **further ORDERED** that this case shall remain on the docket of this Court, and on compliance by Big Ridge with its obligations undertaken hereto, and upon disposition of the matters pending before NLRB, the agency shall cause this proceeding to be dismissed.

        **IT IS SO ORDERED.**

        DATED:  April 30, 2012

                                      /s/ G. Patrick Murphy
                                      G. PATRICK MURPHY
                                      United States District Judge